This is a video of the Daewood Electric v. Daewood Electronics   I have been using it for a long time.  I would like to begin my presentation today with an issue that cuts across all the patent claims in this case, and that is the improper application of the entire manufacturer's patent. The entire market value rule to the calculation of lost profits in this case. In this case, there were three patents asserted, and the $7 million jury verdict depends on the award of lost profits. And these lost profits, in turn, depend on the application of the entire market value rule. And the application of the entire market value rule to the lost profits award in this case is crystallized on page 30 of Funai's response brief. In which they say that their lost profits are identical whether one or more of the 018, 210, and 538 patents were infringed. In other words, the amount of lost profits is derived entirely under their calculation from the infringement of any of the asserted claims. Now, the problem with this is myriad. But the biggest problem is that there is simply no evidence that any one of the patented features are responsible for the entire market value of these VCRs. And probably the best example is the feature claimed in the 538 patent. That is a circuit from which you can admit a six cent transformer. And it's an oscillating circuit that's used for the erase heads, which are part of the recording circuit, which is part of a VCR deck, which is included into a variety of different types of VCR products. Such as standalone VCRs, VCR DVD combo players, or VCR TV combos. Now, according to Funai, its profits for those products range from approximately $4 to approximately $12.50. But the features for each one of those types of products, the patented features, is exactly the same. So what is missing in this case is any evidence of any kind that the allegedly patented features are what drove the customer demand for the products that Funai was allegedly unable to sell. Well, this is almost a new argument, isn't it? Perhaps not surprising in view of the evolving case law. Do I see it's only in page 67 that you've raised this issue? In our principal brief, I believe you raised it at page 67. And then we raise it again. It's a two page argument. It is, Your Honor. But it is an argument that, as I said, cuts across all of the claims. Most importantly, it's based on the absence of any evidence. So from our perspective, there's no real point in belaboring it unduly. Now, certainly you are right. It has been the subject of considerable discussion before this court. I have a question with respect to these OEM sales. Were the OEM customers U.S. customers? Were these sales made in the United States? The sales made by the OEMs or by Funai? No, by Funai. They were. I believe they were, yes. Is that in the appendix any place? Your Honor, I don't have that at my fingertips, but perhaps I could provide it. Okay, I would appreciate that. Does the record reflect any discussions between Funai and its OEM customers as to patent markings? What the record reflects and what the testimony was at trial was that Funai's OEM customers would not mark. Was Funai requested that they mark and the customers refused? As I understand it, I don't recall if there was a request that was refused or if Funai simply did not request. But the testimony was that the OEM customers would not mark because it was a sensitive issue related to their packaging. And so the way the OEM marketing issue in this case plays out is that Funai was aware that its OEMs were not marking and it simply accepted that and made no efforts other than to recognize that it was a sensitive issue for them. And that, of course, is what distinguishes the marking situation here from the case law such as Maxwell, a case where the patentee was unable to have licensees mark all of the products but made diligent efforts to ensure that as many products as possible were marked. Are you saying that a patentee selling products to an OEM need not make any efforts to have those products marked because they are the product of another? That the patentee is in effect simply acting as the manufacturer and nothing more and that the product is the OEM's product and whether it's labeled or not is up to the OEM? Is that what you're saying? No, we're not. We're saying that as a patentee, in order to enjoy the benefits of the constructive marking statute, there is an obligation to make affirmative efforts to ensure the products sold to the public are marked with the patent numbers. And so that is our position. And you're saying that that was met simply by asking the OEM customer to do that and when the OEM customer refused, then your duties were satisfied? Actually, we're saying that FUNAI's duties were not satisfied and we're saying that they did not meet the constructive marking requirements by failing to have their OEMs mark the products. I see. Let me ask you another question about the transfer agreement and some confusion in my mind as to whether the transfer agreement does or does not relate to the U.S. companies. Can you enlighten me a little here? Absolutely. The transfer agreement was an agreement between the Korean parent companies of the U.S. sales subsidiaries. And what happened was when the parent company, the Korean predecessor parent company, sold its assets to the company that followed, our current client, Daewoo Electronics, the current Daewoo in Korea, that transfer agreement transferred the assets between those two companies. One of those assets was the U.S. subsidiary. So that agreement relates to the U.S. subsidiaries in that that was how that asset, the subsidiary, was transferred between the two companies. And because that agreement is governed by Korean law, which does not provide for successor liability if certain requirements are met, and those requirements were met, there is no successor liability between either the parents or the subsidiaries. Are those agreements in the appendix? They are. Can you tell me where they are? Yes. And I need also a moment for that as well, because the focus here for Funai, I believe, was to move away from the transfer agreement and to say the transfer agreement here doesn't matter, because, again, the transfer agreement specifically identifies Korean law as applying. And the only facts available before the district court was that under Korean law, there is no successor liability. Why isn't American law? Why isn't the interest of the United States in liability for damages for infringement of a U.S. patent paramount here rather than the Korean law with respect to successor liability? Well, the United States law of patent infringement, that interest has been met by the proceedings that occurred in the district court and led to the default judgment. So the patent laws of the United States, to the extent they're implicated, have been exonerated, have been met by the default judgment. There is a default finding of infringement. Yes, but if there was this shifting around in Korea and someone who's basically responsible for the infringement walks away from it, then the American interest in vindicating the integrity of its granted patents is lost. Well, the issue actually here is the enforcement of a judgment. The patent laws provide for a judgment of infringement and damages. And then, like any other judgment, the judgment can be enforced under state laws or through various mechanisms. And the patent law in Congress has not concerned itself with the enforcement of judgments that is left to the states and the various laws that exist for the enforcement of judgments. And here, there was a judgment, a default judgment, against a New Jersey entity. And whatever efforts Funai made to enforce that judgment under New Jersey law failed. I mean, the normal course is to, if you have a company that goes out of business and the assets are plundered from the company, you would go after the shareholders, the owners of the company. And that's what New Jersey law provides. Here, for whatever reason, that did not happen. So, to look at the interest of New Jersey, here, the interest of New Jersey would not be, are not served because the party seeking to enforce the successor liability is a Japanese corporation with no ties to New Jersey. In other words, New Jersey's law- Well, you can't say they have no ties to New Jersey. Well, they own a sales subsidiary in New Jersey. That is correct. And presumably, they sell products in New Jersey. That matters for something, does it not? It does. It does. But when you look at whether a state has an interest in enforcing its laws- I'm questioning not the state's interest, but the country's interest. Right. Because the United States issued the patent, not the state of New Jersey. That's exactly correct. And when the Congress enacted the statute to provide damages, an award of damages, and the federal courts can issue judgments, Congress did not authorize remedies or extend the remedies for patent law to successor liability. That was not something that the patent laws are designed to do. That falls to state law and to question whether or not- It doesn't go either way. There's nothing in the patent statute either way when you're saying that it wasn't enacted. It wasn't said that it's forbidden. That's true. But when we're looking at the interest, the interest to be protected by New Jersey law, the patent laws are not the scope of New Jersey. It's not New Jersey's interest to enforce the patent laws. That was Congress's interest, and it's Congress's exclusive sphere to legislate the patent laws if you want. And so to say that New Jersey has an interest in enforcing the patent laws, there's really no support to say that that's something that falls to New Jersey. It's an issue of judgments and enforcing judgments. And when you look at the interest of New Jersey, there are no New Jersey citizens whose interests will be protected by the application of successor liability in this case. And that's how the state's interest test is evaluated under the California case law for evaluating choice of law. And as the district court found, when you're looking at which state's interest will be advanced, you look at whether or not the laws protect or would harm a citizen of the state. And in this situation, there is no evidence that the application of New Jersey law would benefit a citizen of New Jersey in any way. In fact, it would be detrimental to the only party to this case who is a citizen of New Jersey, and that is Daewoo Electronics America, the current Daewoo. OK. All right. Let's hear from the other side and we'll save you rebuttal time. Well, thank you. Good morning. If I could just respond on the lost profits point. The council expressed some concern that there would be the same lost profits for each patent that was infringed. But, of course, that is the law. If the sale was made but for the infringement, whether that was one patent, two patents, or all three, you're entitled to lost profits in that circumstance. What about the entire market value rule? We've had some recent case law which has sort of refined the previously existing law, and presumably that's why your opponent has raised that as his first issue, despite the fact that his brief didn't get to it until page 67. The question is, is the patented invention the basis for the lost profits? Should we remand for a consideration of this issue in light of Lucent? Absolutely not, Your Honor. This actually case has some extraordinarily powerful evidence that isn't typically before the court. Specifically, the overwhelming majority of the lost profits here were to a single customer, Target. It was based on direct evidence of the vice presidents of sales at Funai who attended head-to-head competitions between Funai and Daewoo, in which Funai, who had been the incumbent, they were the supplier of VCRs to Target, lost that business to the infringing VCRs. There was direct testimony that that could only have been accomplished using the infringing features, and in fact, that testimony came not only from Funai, it came from Daewoo. Let's take, for example, the 210 patent. That allowed the first high-performance PWM motor to be used in a VCR, which solved the problem of slow rewind speeds. A lot of customers, people may recall, used to get rewind charges if you brought back tapes. They hadn't been rewinded. Customers were very interested in getting high-speed rewind. The VP of sales said that was a necessary feature. According to the Daewoo engineer, this is the quote from the Daewoo engineer himself, he said high-speed rewind was required in the market. In fact, all the testimony was that these were necessary features. The 018 patent made VCRs smaller, also lowered the price for shipping and for warehousing. What was unique about this case is Funai put on witnesses, salespeople who were in the room who actually were making these sales, who testified about the profits that they lost. Daewoo chose not to put on any witness. They didn't put on any sales witness to even try to contradict and argue that these features weren't the critical features that drove sales. What about the 538 patent, the six-cent savings for the series circuit? The testimony was that there was an example where it was six cents. The testimony that Funai witnessed was it averaged about 10 cents. There was testimony in the record that this was a brutally price-competitive business and every penny did count. Even a 10-cent margin may have been the cause of the difference. There were three patents here that were found to infringe the high-speed rewind, the smaller size, and the lower price. If the only patent that survives is the 538 patent, what effect does that have on the fair market value damages assessment? I think if that is the only patent that survives, there would need to be a remand on damages, Your Honor. Not necessarily because of the entire market value issue, but because of some of the disputes about the number of products that included that product. But if either the 018 patent or the 210 patent is affirmed, the entire damages award should be upheld. I would just note, further on that exact point, on the 210 patent, that was never practiced by Funai after the patent issued, so these marking issues do not apply at all on the 210 patent. They haven't appealed that, so there's no question of marking there. In fact, the issue of OEM marking that you raised... I was just about to get that. I'll save you the effort. That only applies to a single patent in this case. Because first of all, the 538, there was never any assertion that it was marked. From the very first, the only request for damages was on the date that notice was provided in April 2003. So there's only one patent where the question of marking even comes into play, and there you're only talking about four months. Because the entities began selling in October 2002, they received a clear notice letter showing infringement in April 2003, early April 2003. So you're really only talking about four months. And even if you exclude all that from the damage base, and even if the 018 were the only patent to survive, it would still support the entire jury verdict because the expert testimony of Funai's expert was that even for the period for just target sales, after the notice letter was over the damage award by the jury, which was 7.2, and the expert had calculated about 7.4 million. What is your position with respect to the marking obligation? Those are sort of the questions that I ask your adversary. Is it your view that a patentee in selling patented products to an OEM customer is obligated to take steps to assure that those products are marked, or is there a distinction between sales to an OEM customer as compared to a licensee, for example? I think the court has treated a bit differently products that a company sells itself versus products that are ultimately sold by a third party. I think there's still a requirement to use some efforts to mark them, but it understands that The nature of an OEM sale doesn't change that calculus as far as you're concerned? Oh, I think it does lower the bar somewhat because FUNAI was making a product for another company who controlled the packaging, who made decisions about what was going to appear on that product. Does that relieve the patentee from any obligation to put the patent number? Well, the evidence here that's undisputed is FUNAI marked 100% of the products it sold under its brand names. I understand that. And that was the overwhelming majority of the products. It was in the order of 90% of all the products. And so under these facts, we believe that given that there was some third parties who didn't mark, but it was a very small percentage, and this is a fact issue that we think there's substantial evidence that a jury could rely on to find that there was sufficient evidence. And I guess what I'm getting at is whether there's an obligation in the first place. If your argument is that, well, these are not the patentee's products or the patentee's licensed these products. The patentee is just functioning as a manufacturer of products that really belong to others, and others are responsible for what they put on their products. If that's your argument, then it wouldn't matter how many sales. I think that's right. So if a patentee sold 10% of its sales were sales it made itself with a patent number, and then 90% were sold to OEM customers that the market could be flooded with those 90% with no patent markers, the patentee would still not... Would be entitled to constructive notice under the statute. Well, I think where the court has been clearest is in the context of licensees, and it does require some effort. I understand that, but it's in the context of OEMs that I'm trying to get to. It could be that those products are in... The OEM customer has a right to sell those products free of any infringement risk because there's at least an implied license. Well, there's certainly an implied license. They're buying it from FUNAI. They have a license to use it. That kind of brings it back into the fold of maybe they should be considered similar to a licensee when it comes to marking. Well, I think to the extent there is some effort required, I think the testimony here was that FUNAI made an effort, but that its OEMs weren't interested in marking. But now let's assume that there is the obligation, and let's assume that FUNAI did say, okay, fine, I'd like you to put the patent number, and the OEM customer said, well, it's our product. We don't want to do that. Now, you're arguing that it doesn't amount to much because it was, what, 9%, 10%, something like that. But my understanding of the few cases that have touched on this is that where there are products that do not contain the required marking, that can be excused if there's an explanation. Either it was a small amount, there was a production run, and they forgot to put the labels, and we took steps to put them on. There were some efforts to be diligent and to either rectify the problem or to explain that this was the exception and not the rule, as opposed to circumstances where 9% to 10%, 9% to 12% of products were simply permitted to be sold without the marking. So my question is, if there is a marking obligation, isn't the amount involved here sufficient to take it out of the statute simply because FUNAI permitted it? Well, there is case law that talks about as much as 5% being sold, and courts upholding a verdict that was substantial. We think because it was a third party. And they're usually in the context of 5%, but it was inadvertent or there were steps made to correct it or some such thing, correct? In that case, I believe it was a license. I can't remember the circumstances exactly in that particular case. But I would point out... It's not where you have... I would submit that between 9% and 12% is not an insignificant percentage, and it was permitted, if you will. It was not a question of an inadvertent failure to mark or something that was where steps weren't taken, correct? It was permitted. Your Honor, I guess I would harken back to one of my earlier points that this really only applies to a single patent for four months of damages, and I don't think it would undermine the verdict even if... I hear you, but I'm just focusing on that one little window. I understand. Your Honor, I don't want to take all your time. What are your comments with respect to this transfer agreement and the issue with respect to successor liability? So the transfer agreement says absolutely nothing about the U.S. subsidiaries. And so I think what happened with the district court is it made a decision about what law to apply on the parent companies and it sort of rolled that into the U.S. companies, and we think that was an error. The transfer agreement did not convey the assets of the U.S. companies? It did not. It didn't refer to them, didn't say anything about them. One day they came in and they were Daewoo Electronics America Corp., and then the next day they were Daewoo Electronics Corporation of America. I think I got that backwards. But they just switched the order of the words in their name. It was the same employees selling the same VCRs in the same building. They just had a new name. They weren't part of the transfer agreement. What agreement affected this conveyance? That's an excellent question. We were never able to get any documentation on that. It was just a continuation of the same business under a different name. There wasn't a separate corporation? There were two corporations. So there was actually an existing Daewoo Corporation that was responsible for sales in South America, which suddenly became the corporation that was also responsible for the U.S. VCR sales in New Jersey. But the testimony from the witnesses was it was the same people working at the same company. In fact, for a period of time they were wearing two hats. They would actually go out and collect accounts receivable for what was the prior company, and they were still doing business for the current one. That's why we feel the law of New Jersey is uniquely implicated by these facts. New Jersey has a successor liability law that says where a company is a mere continuation, there's a de facto merger, they shouldn't be allowed to use that to essentially put behind them a liability, a liability that arises under any law that applies in New Jersey, be that a tort law or U.S. patent law. These were New Jersey corporations? They were operated and run out of New Jersey. I believe the current company may be incorporated in Florida, but it's still the VCR business was run out of New Jersey. But what do the records of the state in which they are incorporated reflect in terms of the operation before the transfer and operations after the transfer? Were there any documents recorded? The defaulted party basically didn't produce documents. They dissolved. We know very little about them. The new company, the party that's here represented, basically said we don't have documents on the previous company. It was a mysterious transaction, to be honest, and that's why we think it is a very appropriate one for the application of successor liability. Actually, if I could address one specific point that counsel raised, and he said you shouldn't apply New Jersey law because New Jersey has no interest in increasing the liability of a corporation that does business there. That is not the rule in California. In fact, the Hurtado case that we cite found exactly the opposite. They said California, in that case, had a decided interest in applying its tort law against a California tort feeser because it has an interest in regulating conduct within its borders. In fact, the case law is uniformly clear that New Jersey has a strong interest in regulating conduct inside its borders, such as infringing conduct, and making sure that that liability is addressed. Okay. Any more questions? Any more questions for Mr. Lyons? Thank you. Thank you, Mr. Lyons. Mr. Clark. Thank you. If I may return to the lost profits point and address the points raised by Mr. Lyons. The idea here that the but for causation that they point to satisfies the entire market value rule is not supported by the evidence. At most, the evidence to which he cited shows that FUNAI lost a sale. The question that's unanswered is how much profit are they entitled to as a result of that lost sale? How much profit did they lose? This is not a case like Juicy Whip versus Orange Bang where you're talking about a product that completely embodies the patent. The drink dispenser completely embodied the patent. Here, we have a product that has many, many features, and the evidence shows that it's not the patented features that have anything to do with the amount of the profit. The profit here varies widely among the products that use the patented inventions for reasons that are completely unrelated to the patented features. Didn't the patented features determine who got the business? If you accept that evidence. It's relevant to lost profits. If you accept that evidence, which I don't think you're obligated to do, because the evidence of why one party got the business versus another party is unclear. It's not clear that it's patented features. If you take that as true, that but for our presence in the market with those features, they would have got the sale, the question that remains unanswered is how much profit are they entitled to? Are they entitled to profit based on the total sales price of all of the products they claim they would have sold? It's undisputed here that the evidence that was presented to the jury was that the profit was based on the total sales price. This isn't a situation where we're asking to second guess a factual finding made by the jury. This is a situation where there was just no evidence that the patented features had anything to do with customer demand. To turn briefly just to touch on the two patents that, if they are removed, they would implicate marking. On the 210 patent, which is the patent where we point out the prosecution history estoppel, should not apply. I think the most important point there is that there is no explanation of any kind in the prosecution history for the reason for the amendment. There's no identification of the rationale for why the claim was amended. In that case, you're left with a concession that the amendment was narrowing, and then they're trying to say that the rationale for the amendment is tangential to the alleged equivalent. But there is no rationale, and the alleged equivalent is alleged to infringe the limitation that was added during the prosecution. There's a direct relation. Then finally, on the 018 patent, which is the other patent, that if there's a finding of no infringement, counsel conceded that the case would need to be remanded, at the very least, for damages. That's the 018 patent. In that situation, the district court entered summary judgment of infringement that the Daimu VCRs infringed the opened limitation. And the question was... Is this rebuttal, Mr. Clark? It is not, Your Honor, and I can move on if you prefer. Okay. So turning now to the corporate forms and to discuss reliability. If you can wrap it up on that point. Absolutely. The key point that I think that was recognized was the corporate forms. The corporate forms here existed after the transfer. The company, the predecessor, New Jersey Company, continued to exist. There are corporate records maintained by the Secretary of State as to who the investors were, who the owner of that company was, and that was the predecessor, Korean Company. And it sold that asset. It sold virtually all of its assets to the new Korean Company. So in a situation like that, where ownership of the company changes hands, there is an allegation that funds do not remain to pay off liabilities, the course of action is against the former owner, the entity that sold that company and received the compensation. And that's why successor liability would not apply. But more importantly, to address the final point, Mr. Lyons referred to the Hurtado case, which is a California case, where there's a holding that they would not apply the law of another jurisdiction because California's laws were designed to regulate conduct within California. And in that case, the important distinction was between a law limiting liability, which was the law that the plaintiff urged to be applied, as opposed to a law regulating conduct. And in that situation, the law of the foreign jurisdiction would not have benefited, would not have regulated conduct in California, therefore California had no interest in applying a limitation of liability from another jurisdiction. So the point being that in a situation where a law regulating conduct would harm the interest of a citizen of the state, that state doesn't have an interest in applying that law. Any questions? Before you sit down, do you have any appendix sites on the transfer agreements? I do, yes. The transfer agreement was not cited, as it turns out, and with respect to- I didn't think so, which is why I was anxious to find out. But is it in the record? It is in the record below, yes. If it's in the record, this is something that you'd like to see? Yes, I'm sure we can find it. Okay. And then on the- The OEM? Yes. The testimony was that it was not marked, and the reason why was because the OEMs were conscientious, and they were nervous about packaging, and that was the extent of the testimony. I think that's in the briefs. Okay. Thank you, Mr. Clark and Mr. Lyons. The case is taken under submission.